**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
Jeffrey A. Shooman
Two Gateway Center – Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile:  (973) 623-0858
bgreenberg@litedepalma.com
jshooman@litedepalma.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID SERR, Individually and On Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION** |
| v. | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| THE MEDICINES COMPANY, CLIVE A. MEANWELL, GLENN P. SBLENDORIO, and PAUL M. ANTINORI, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff David Serr ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding The Medicines

Company, ("Medco" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Medco securities between February 20, 2013 and February 12, 2014, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     The Medicines Company is a global pharmaceutical company focused on providing medical solutions for critical care patients in acute and intensive care hospitals worldwide. The company markets drugs such as Angiomax, Recothrom, Cleviprex, and ready-to-use formulation of Argatroba.   Its products under development include Cangrelor, Oritavancin, and IONSYS. The Company's products under development also comprise a pre-registration stage product named MDCO-157 and two Phase I trial drugs named MDCO-216 and ALN-PCS. In addition, it offers acute care generic products for use in the cardiovascular, neurocritical care, and serious infection therapeutic areas.

3.     One of the Company's most promising prospects in its pipeline was the Cangrelor drug, which is intended to prevent platelet activation and aggregation in patients undergoing Percutaneous Coronary Interventions ("PCI") such as angioplasties.  The Company conducted a series of three CHAMPION trials, including CHAMPION PCI, CHAMPION PLATFORM and CHAMPION PHOENIX, to test the efficacy and safety of the product to decrease thombrotic

2

events, such as blood clots, either during or after PCI.  The CHAMPION PHOENIX trial tested

the efficacy of Cangrelor as compared to clopidrogel, a competing drug manufactured by Bristol

Myers Squibb and Sanofi, under the trade name Plavix.

4.      Throughout the Class Period, Defendants touted the results of its CHAMPION

trials, claiming "statistically significant" results which had met the trials' primary endpoints.

With respect to the CHAMPION PHOENIX trial, the Company claimed that the trial

"demonstrated that transition from cangrelor to oral clopidogrel 600mg administered

immediately after cessation of the cangrelor infusion significantly reduces thrombotic events at

48 hours compared to clopidogrel alone." As a result of these findings, the Company claimed

that Cangrelor "will compete with oral platelet inhibitors that are well known and widely used in

acute and intensive care settings, such as Plavix (clopidogrel) from Bristol Meyers

Squibb/Sanofi".

5.      Throughout the Class Period, defendants made materially false and misleading

statements regarding the Company's business, operational and compliance policies. Specifically,

defendants made false and/or misleading statements and/or failed to disclose that: (1) Cangrelor

did not show superiority to clopidogrel; (2) The clinical trials sponsored by Medco were

unethically and inappropriately administered, including by delaying administration of

clopidogrel and lowering its dosage; and (3) as a result of the foregoing, Medco's public

statements were materially false and misleading at all relevant times.

6.      On February 10, 2014, the U.S. Food and Drug Administration ("FDA") released

briefing documents ahead of a review by its Cardiovascular and Renal Drugs Advisory

Committee ("CRDAF"), which was scheduled to review the New Drug Application ("NDA") for

Cangrelor on February 12, 2014.

3

7.      In the briefing document,  Thomas A. Marciniak, M.D., the FDA's Medical Team Leader for the review, found that Cangrelor did not show superiority to clopidogrel, and that the clinical trials sponsored by Medco were unethically and inappropriately administered, including by delaying administration of clopidogrel and the lowering of the dosage of clopidrogel in the PHOENIX CHAMPION trial.  According to Dr. Marciniak, "the CHAMPION trials were conducted unethically.  We can refuse approval of cangrelor based on that fact alone."

8.      As a result of this news, Medco securities declined $1.80 or over 5%, on heavy volume, to close at $32.42 on February 10, 2014.

9.      On February 12, 2014, the Company issued a press release announcing that NASDAQ had halted trading of the company's stock because an FDA advisory panel was meeting to discuss the new drug application (NDA) for Cangrelor.

10.     Later, on February 12, 2014, the FDA advisory panel voted 7-2 that Medco's Cangrelor should not be approved to prevent blood clots during heart procedures.

11.     As a result of this news, when trading resumed on February 13, 2014, Medco securities declined $3.82 or over 11.5% from the previous close, on very heavy volume, to close at $29.28 on February 13, 2014.

12.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

4

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant is headquartered in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

16.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

17.     Plaintiff, as set forth in the attached Certification, acquired Medco securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

18.     Defendant Medco is a Delaware corporation with its principal executive offices located at 8 Sylvan Way, Parsippany, NJ 0705. Medco's common stock trades on the NASDAQ Global Stock Market ("NASDAQ") under the ticker symbol "MDCO."

19.     Defendant Clive A. Meanwell ("Meanwell") has served at all relevant times as the Company's Chief Executive Officer and Chairman.

20.     Defendant Glenn P. Sblendorio ("Sblendorio") has served at all relevant times as the Company's Chief Financial Officer, Treasurer, and Director.

21.     Defendant Paul M. Antinori ("Antinori") has served at all relevant times as the Company's Senior Vice President, General Counsel, and Secretary.

22.    The defendants referenced above in ¶¶ 19 - 21 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.    Medco provides medical solutions for patients in acute and intensive care hospitals worldwide. The Company markets Angiomax, an intravenous direct thrombin inhibitor used as an anticoagulant in combination with aspirin in patients with unstable angina undergoing percutaneous transluminal coronary angioplasty, as well as for use in patients undergoing percutaneous coronary intervention; Recothrom, a human recombinant thrombin used as an aid to hemostasis; Cleviprex, an intravenous small molecule calcium channel blocker for blood pressure reduction; and ready-to-use formulation of Argatroban for the treatment of thrombosis.

24.    Its products under development include Cangrelor, an intravenous small molecule antiplatelet agent for the prevention of platelet activation and aggregation; Oritavancin, an investigational intravenous antibiotic, which is in Phase III clinical trial for the treatment of acute bacterial skin and skin structure infections; and IONSYS, a pre-registration stage product for the short-term management of acute postoperative pain.

25.    The Medicines Company was founded in 1996, incorporated in the State of Delaware, and is based in Parsippany, New Jersey. Medco's common stock trades on the NASDAQ Global Stock Market ("NASDAQ") under the ticker symbol "MDCO."

### Materially False and Misleading
### Statements Issued During the Period

26.    On February 20, 2013, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the fourth quarter and fiscal year ended December 31, 2013.

6

27.     For the fourth quarter, the Company announced that revenues increased by 20.6% to $159.5 million for the fourth quarter of 2012, from $132.2 million in the fourth quarter of 2011.   Net income for the fourth quarter of 2012 was $20.7 million, or $0.38 per share, compared with net income of $19.6 million, or $0.36 per share, for the fourth quarter of 2011. For the full year ending 2012, the Company reported that net revenue increased by 15.2% to $558.6 million for 2012, from $484.7 million in 2011. Net income for 2012 was $51.3 million, or $0.93 per share, compared with net income of $127.9 million, or $2.35 per share, for 2011.

28.     In the press release the Company stated:

Our Phase 3 R&D projects have produced positive results recently and we look forward to the oritavancin Phase 3 SOLO-2 trial completion and preparing for worldwide regulatory filings for cangrelor.

29.     On March 1, 2013, the Company filed a Form 10-K with the SEC which was signed by Defendants Meanwell and Sblendorio, and reiterated the Company's previously announced quarterly and fiscal year-end financial results and financial position. In addition, the 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Meanwell and Sblendorio, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

30.     In the 10-K, the Company stated in relevant part:

In January 2013, we announced that data analysis of our Phase 3 CHAMPION PHOENIX clinical trial revealed that the protocol defined primary composite efficacy endpoint of death, myocardial infarction, ischemia driven revascularization and stent thrombosis at 48 hours had been met, as cangrelor demonstrated statistically significant improvement for this endpoint as compared to clopidogrel. Safety outcomes from the trial were similar to those observed in prior trials. We expect that the trial results will be presented at the American College of Cardiology Scientific Session in March 2013.

\*\*\*

We expect that cangrelor, if approved, will compete with oral platelet inhibitors that are well known and widely used in acute and intensive care settings, such as Plavix (clopidogrel) from Bristol Meyers Squibb/Sanofi Pharmaceuticals Partnership and generic formulations of clopidogrel, Effient (prasugrel), an anti-platelet agent from Eli Lilly and Daiichi Sankyo, and BRILINTA. We believe that cangrelor, if approved, will compete with these products on the basis of its profile which addresses the needs in acute intensive care setting by combining its bioavailablity with platelet inhibition to prevent thrombotic events and achieve fast offset of effect to prevent bleeding risk during and after surgery.

31.     On April 24, 2013, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the first quarter ending March 31, 2013. The Company reported that net revenue increased by 23% to $155.8 million for the first quarter of 2013, from $126.6 million in the first quarter of 2012. Net loss for the first quarter of 2013 was $11.6 million, or $0.21 per share, compared with net income of $7.6 million, or $0.14 per share, for the first quarter of 2012.

32.     In the press release,  the Company stated:

First quarter 2013 revenue growth puts us on a positive trajectory this year and continues momentum from recent performance and net loss for the quarter is slightly better than our guidance. We also advanced our portfolio of acute and intensive care hospital medicines, as we recently completed enrollment in the oritavancin Phase 3 SOLO-2 trial and reported the positive results of the Phase 3 cangrelor PHOENIX trial.

33.     On May 10, 2013, the Company filed a Form 10-Q with the SEC which was signed by Defendant Sblendorio, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Meanwell and Sblendorio, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

34.     On July 24, 2013, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the second quarter ending June 30,

2013. The Company reported that net revenue increased by 27% to $172.8 million for the second quarter of 2013, from $135.7 million in the second quarter of 2012. Net income for the second quarter of 2013 was $18.1 million, or $0.30 per share, compared with net income of $13.8 million, or $0.25 per share, for the second quarter of 2012.

35.     In the press release the Company stated:

Our first half 2013 revenues show a continued diversification of growth sources, as our hospital portfolio and global geographies expand. Additionally, our near term anticipated growth drivers advanced significantly in the second quarter, as we reported positive Phase 3 results of the oritavancin Phase 3 SOLO II trial, filed for US approval for cangrelor, and completed clinical work toward filings for IONSYS.

36.     On August 9, 2013 the Company filed a Form 10-Q with the SEC which was signed by Defendant Sblendorio, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Meanwell and Sblendorio, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37.     On October 23, 2013, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the third quarter ending September 30, 2013. The Company reported that net revenue increased by 27% to $172.8 million for the second quarter of 2013 from $135.7 million in the second quarter of 2012. Net income for the second quarter of 2013 was $18.1 million, or $0.30 per share, compared with net income of $13.8 million, or $0.25 per share, for the second quarter of 2012.

38.     In the press release the Company stated:

Cangrelor is an investigational intravenous, direct-acting, P2Y12 receptor antagonist in development for prevention of platelet activation and aggregation that leads to thrombosis in the acute care setting including in patients undergoing PCI. A pre-specified, pooled analysis of patient-level data from CHAMPION-

PCI, CHAMPION-PLATFORM, and CHAMPION-PHOENIX was presented at the European Society of Cardiology in September and concurrently published in The Lancet. On October 9, The Medicines Company also announced completion of two pharmacodynamic trials evaluating the transition of its investigational acute intravenous antiplatelet agent, cangrelor, to chronic oral therapy with ticagrelor (Brilinta®) or prasugrel (Effient®) in patients with coronary artery disease (CAD). These data are also expected to be published in peer review journals. On July 1, The Medicines Company announced that the U.S. Food and Drug Administration (FDA) accepted the filing of the New Drug Application (NDA) for cangrelor. The Medicines Company anticipates submission of a European Market Authorization Application (MAA) in the fourth quarter of 2013.

39.     On November 5, 2013 the Company filed a Form 10-Q with the SEC which was signed by Defendant Sblendorio, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Meanwell and Sblendorio, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40.     In the 10-Q, the Company stated:

Cangrelor Clinical Trial Program.   In September 2013, we presented and published a pooled analysis of our CHAMPION clinical trial program, which consisted of three Phase 3 clinical trials of cangrelor (CHAMPION-PCI, CHAMPION-PLATFORM and CHAMPION-PHOENIX). In the trials, we compared IV cangrelor to either oral clopidogrel or placebo for prevention of thrombotic (clotting) complications during and after PCI. The totality of evidence in the approximately 25,000 patients undergoing PCI that participated in the trials demonstrated that cangrelor significantly reduced the odds of the primary composite endpoint of death, myocardial infarction (MI), ischemia-driven revascularization (IDR) or stent thrombosis (ST) at 48 hours after randomization. These findings of the pooled CHAMPION program confirm the results of the CHAMPION PHOENIX trial presented and published in April 2013. We presented this pre-specified, pooled analysis of patient-level data at the European Society of Cardiology and published it in The Lancet.

In October 2013, we completed two pharmacodynamic trials evaluating the transition of intravenous cangrelor to chronic oral therapy with ticagrelor (Brilinta®) or prasugrel (Effient®) in patients with coronary artery disease, or CAD. The pharmacodynamic studies were each conducted in 12 CAD patients to test the consistency of inhibition of platelet aggregation when oral ticagrelor or prasugrel were administered during or immediately after cangrelor infusion.

Ticagrelor and prasugrel are the newest commercially available agents that inhibit platelets via the P2Y12 receptor, the same receptor that is inhibited by cangrelor. These agents are administered with the goal of decreasing the risk of thrombotic events during and after PCI. The purpose of these pharmacodynamic trials was to demonstrate that patients treated with intravenous cangrelor can be directly transitioned to the oral drug without a significant decrease in the extent of inhibition of platelet aggregation. The new pharmacodynamic studies add to clinical data from the CHAMPION PHOENIX trial that demonstrated that transition from cangrelor to oral clopidogrel 600mg administered immediately after cessation of the cangrelor infusion significantly reduces thrombotic events at 48 hours compared to clopidogrel alone.

The FDA accepted the filing of the NDA for cangrelor in the United States in July 2013 and we expect to file an MAA in the European Union in the fourth quarter of 2013

41.     The statements referenced in ¶¶ 26-40 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (1) Cangrelor did not show superiority to clopidogrel; (2) the clinical trials sponsored by Medco were unethically and inappropriately administered, including by delaying administration of clopidogrel and lowering its dosage; and (3) as a result of the foregoing, Medco's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

42.     On February 10, 2014, the U.S. Food and Drug Administration ("FDA") released briefing documents ahead of a review by its Cardiovascular and Renal Drugs Advisory Committee ("CRDAF"), which was scheduled to review the New Drug Application ("NDA") for Cangrelor on February 12, 2014.

43.     In the briefing document, Thomas A. Marciniak, M.D., the FDA's Medical Team Leader for the review, found that Cangrelor did not show superiority to clopidogrel, and that the clinical trials sponsored by Medco were unethically and inappropriately administered, including by delaying administration of clopidogrel and the lowering of the dosage of clopidrogel in the

PHOENIX CHAMPION trial.  According to Dr. Marciniak, "the CHAMPION trials were conducted unethically.  We can refuse approval of cangrelor based on that fact alone."

44.     As a result of this news, Medco securities declined $1.80 or over 5%, on heavy volume, to close at $32.42 on February 10, 2014.

45.     On February 12, 2014, the Company issued a press release announcing that NASDAQ had halted trading of the company's stock while an FDA advisory panel met to discuss the new drug application (NDA) for Cangrelor.

46.     Later that day, the FDA advisory panel voted 7-2 that Medco's Cangrelor should not be approved to prevent blood clots during heart procedures.

47.     As a result of this news, when trading resumed on February 13, 2014, Medco securities declined $3.82 or over 11.5% from the previous close, on very heavy volume, to close at $29.28 on February 13, 2014.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of a Class consisting of all those who purchased or otherwise acquired Medco securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are defendants herein, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, any entity in which defendants have or had a controlling interest, and any judicial officer who is assigned to this matter.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Medco securities were actively traded on the

NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Medco or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Medco;

- whether the Individual Defendants caused Medco to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Medco securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

13

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

54.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Medco securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Medco securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

55.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

**(Against All Defendants For Violations of
Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

58.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Medco securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Medco securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

59.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Medco securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Medco's finances and business prospects.

60.     By virtue of their positions at Medco, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  These acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

61.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Medco securities from their personal portfolios.

62.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Medco, the Individual Defendants had knowledge of the details of Medco's internal affairs.

63.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Medco.  As officers and/or directors of a publicly-held company, the Individual Defendants had

16

a duty to disseminate timely, accurate, and truthful information with respect to Medco's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Medco securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Medco's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Medco securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

64. During the Class Period, Medco securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Medco securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Medco securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Medco securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

65. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

17

66.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

67.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

68.     During the Class Period, the Individual Defendants participated in the operation and management of Medco, and conducted and participated, directly and indirectly, in the conduct of Medco's business affairs.  Because of their senior positions, they knew the adverse non-public information about Medco's misstatement of income and expenses and false financial statements.

69.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Medco's financial condition and results of operations, and to correct promptly any public statements issued by Medco which had become materially false or misleading.

70.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Medco disseminated in the marketplace during the Class Period concerning Medco's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Medco to engage in the wrongful acts

18

complained of herein. The Individual Defendants, therefore, were "controlling persons" of Medco within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Medco securities.

71.    Each of the Individual Defendants, therefore, acted as a controlling person of Medco.  By reason of their senior management positions and/or being directors of Medco, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Medco to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Medco and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

72.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Medco.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

19

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: February 21, 2014                    **LITE DEPALMA GREENBERG, LLC**


                                            /s/ Bruce D. Greenberg
                                            Bruce D. Greenberg
                                            Jeffrey A. Shooman
                                            Two Gateway Center, Suite 1201
                                            Newark, NJ 07102
                                            Telephone:  (973) 623-3000
                                            Facsimile:  (973) 0858
                                            bgreenberg@litedepalma.com
                                            jshooman@litedepalma.com

                                            **POMERANTZ, LLP**
                                            Jeremy A. Lieberman
                                            Lesley F. Portnoy
                                            600 Third Avenue, 20th Floor
                                            New York, New York 10016
                                            Telephone:  (212) 661-1100
                                            Facsimile:  (212) 661-8665
                                            ***Attorneys for Plaintiff***