## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| WARREN H. SCHULER, Individually and On Behalf of All Others Similarly Situated, | : : : : | |
| *Plaintiff*, | : : : | Civil Action No.: 14-1149 (CCC)(MF) |
| v. | : : | |
| THE MEDICINES COMPANY, CLIVE A. MEANWELL, GLENN P. SBLENDORIO, and PAUL M. ANTINORI, | : : : : : | |
| *Defendants*. | : : | |

---

### LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

---

**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, NJ 07102

**POMERANTZ LLP**
Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, NY 10016

*Attorneys for Lead Plaintiff Warren H. Schuler*

584655.1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

I.     PRELIMINARY STATEMENT ..................................................1

II.    FACTUAL BACKGROUND...........................................................2

III.   PROCEDURAL BACKGROUND AND SETTLEMENT TERMS .............5

IV.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY
       APPROVAL ...............................................................................6

       A.     The Proposed Settlement Merits Preliminary Approval ......................8

       B.     The Proposed Settlement Merits a Presumption of Fairness ..............11

       C.     The Applicable *Girsh* Factors Support Preliminary Approval ...........12

V.     CERTIFICATION OF THE CLASS IS APPROPRIATE...........................17

       A.     The Proposed Settlement Class Satisfies Rule 23(a) ........................17

       B.     The Proposed Settlement Class Satisfies Rule 23(b) ........................19

VI.    THE PROPOSED FORM AND METHOD OF NOTICE IS
       APPROPRIATE ........................................................................20

VII.   PROPOSED SCHEDULE OF EVENTS ....................................................22

VIII.  CONCLUSION.............................................................................23

i

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................19

*Carson v. Am. Brands, Inc.*,
  450 U.S. 79 (1981) ....................................................................................7

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ....................................................................13

*Consolidated Raid Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2d Cir. 1995) ......................................................................18

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001) ........................................................................8

*Ehrheart v. Verizon Wireless*,
  609 F.3d 590 (3d Cir. 2010) ......................................................................7

*Ganino v. Citizens Util. Co.*,
  228 F.3d 154 (2d Cir. 2000) ....................................................................15

*Girsh v. Jepson*,
  521 F.2d 153 (3d Cir. 1975) ....................................................................13

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S.Ct. 2398 (2014) .............................................................................20

*In re Am. Bank Note Holographics, Inc.*,
  127 F. Supp. 2d 418 (S.D.N.Y. 2001) .....................................................16

*In re AT&T Corp. Secs. Litig.*,
  455 F.3d 160 (3d Cir. 2006) ....................................................................10

*In re Imprelis Herbicide Mktg.*,
  296 F.R.D. 351 (E.D. Pa. 2013) ................................................................9

*In re Marsh Erisa Litig.*,
  265 F.R.D. 128 (S.D.N.Y. 2010) .............................................................21

*In re NFL Players Concussion Injury Litig.*,
  775 F.3d 570 (3d Cir. 2014) ......................................................................7

*In re Processed Egg Prods. Antitrust Litig.*,
  284 F.R.D. 249 (E.D. Pa. 2012) ..............................................................12

584655.1

*In re Sturm, Ruger, & Co., Inc. Sec. Litig.*,
   3:09-CV-1293 VLB, 2012 WL 3589610 (D. Conn. Aug. 20, 2012) ..................16

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004) ............................................................................11

*Krell v. Prudential Ins. Co. of Am. (in Re Prudential Ins. Co. Am. Sales Practice
   Litig. Agent Actions)*,
   148 F.3d 283 (3d Cir. 1998) ...................................................................... 6, 11

*Lazy Oil Co. v. Witco Corp.*,
   95 F. Supp. 2d 290 (W.D. Pa. 1997), *aff'd*, 166 F.3d 581 (3d Cir. 1999) ..........10

*Mangone v. First USA Bank*,
   206 F.R.D. 222 (S.D. Ill. 2001) ......................................................................21

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001) ...........................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................................13

*Turner v. NFL (In re NFL Players' Concussion Injury Litig.)*,
   307 F.R.D. 351 (E.D. Pa. 2015) ......................................................................12

*Turner v. NFL (In re NFL Players' Concussion Injury Litig.)*,
   301 F.R.D. 191 (E.D. Pa. 2014),
   *appeal dismissed*, 775 F.3d 570 (3d Cir. 2014) ...................................................8

**Statutes**

15 U.S.C. §78u-4(a)(7) .......................................................................................21

**Rules**

Fed. R. Civ. P. 23 ................................................................... 8, 17, 19, 21

**Other Authorities**

Dr. Renzo Comoli & Svetlana Starykh, NERA Economic Consulting,
   *Recent Trends in Securities Class Action Litigation: 2014 Full-Year Review*
   (Jan. 20, 2015),
   http://www.nera.com/content/dam/nera/publications/2015/Full_Year_Trends_20
   14_0115.pdf ....................................................................................................11

*Manual for Complex Litigation (Fourth)* (2004) .......................................................7

## I.    PRELIMINARY STATEMENT

Lead Plaintiff Warren H. Schuler, on behalf of all Class members pled in this Action, seeks preliminary approval of the settlement set forth in the Stipulation of Settlement dated February 12, 2016 (the "Stipulation"), resolving this Action against all Defendants in exchange for a payment of $4.25 million for the benefit of the Class.[1] Lead Plaintiff requests that the Court enter an order (the "Preliminary Approval Order"): (1) preliminarily approving the proposed settlement set forth in the Stipulation (the "Settlement"); (2) preliminarily certifying a class, for settlement purposes only, of all persons who purchased or otherwise acquired MDCO securities between January 8, 2013 and February 12, 2014, both dates inclusive; (3) appointing Epiq Systems, Inc. as Claims Administrator; (4) approving the form and manner of disseminating notice to the Class; (5) scheduling a hearing to consider final approval of the Settlement and an award of attorneys' fees and expenses; and (6) setting deadlines for the dissemination of notice, the submission of proofs of claim and requests for exclusion, and the filing of objections and papers in support of the settlement.

While the factual merits of Lead Plaintiff's case are strong, the proposed settlement is an excellent result in light of the risk, expense, and uncertainty of prose-

---

[1] The Stipulation is attached to the Declaration of Murielle J. Steven Walsh as Exhibit A. All capitalized terms used herein are defined in the Stipulation.

1

cuting this litigation through trial. Based on a thorough examination of the claims and allegations in this action and an analysis of estimated damages, Lead Counsel believes the proposed settlement is fair, reasonable, adequate, and in the best interests of the Class. Accordingly, Lead Plaintiff requests preliminary approval so that notice of the proposed settlement may be disseminated to the Class.

## II.    FACTUAL BACKGROUND

This is a securities class action on behalf of investors who purchased the securities of The Medicines Company ("MDCO" or the "Company") between January 8, 2013 and February 12, 2014 inclusive (the "Class Period"). Lead Plaintiff brings claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and S.E.C. Rule 10b-5 against the Company and three of its officers (the "Individual Defendants"): Clive A. Meanwell, its Chief Executive Officer and Chairman; Glenn P. Sblendorio, its Chief Financial Officer, Treasurer, and Director; and Paul M. Antinori, its Senior Vice President, General Counsel, and Secretary.

MDCO is a pharmaceutical company that focuses on acute cardiovascular care, surgery and perioperative care, and serious infectious disease care. During the Class Period, one of its most promising prospects was cangrelor, an anti-platelet blood thinner that was once expected to generate up to $450 million in annual sales. Compl. ¶¶ 26–29.

At the time, the leading comparable treatment was clopidogrel (Plavix). Because clopidogrel is taken orally and is not effective until metabolized, it has three major limitations: delayed onset of action, unpredictable response, and poor reversibility. Cangrelor works the same way as clopidogrel (by blocking platelets' P2Y12 receptors, which trigger clot formation), but it is administered intravenously and has a more rapid onset and a shorter half-life. This allows it to be "turned on" quickly when needed and "turned off" quickly when no longer desirable. *Id.*

MDCO sought FDA approval for two indications of cangrelor. The first indication was for patients with heart disease undergoing percutaneous coronary intervention ("PCI"), also known as coronary angioplasty (the "PCI Indication"). PCI is a non-surgical procedure used to open an obstructed coronary artery by inserting a balloon-tipped catheter into the artery and then inflating the balloon at the obstruction site, usually followed by the permanent placement of a mesh tube (a stent) to keep the artery open. Unlike clopidogrel, which had to be administered several hours before PCI because of its delayed onset of action, cangrelor could be administered immediately before PCI. *Id.* ¶ 31.

The second indication was for patients who had to discontinue their usual antiplatelet therapy because of upcoming surgery but who would still benefit from blood thinning in the meantime (the "Bridge Indication"). For example, patients with stents need to take clopidogrel regularly to prevent clots from forming on

3

their stents. But if bypass surgery later becomes necessary, they need to discontinue clopidogrel several days beforehand to ensure that it is fully cleared by the time of surgery. In the meantime, because cangrelor's effect dissipates more quickly and more predictably than clopidogrel's, patients could use cangrelor as a "bridge" between their daily clopidogrel regimen and bypass surgery. *Id.*

In this action, Lead Plaintiff alleges that Defendants knowingly or recklessly made materially false and misleading misstatements about cangrelor and its Champion PHOENIX clinical trial, which was conducted between September 2010 and October 2012. Specifically, Defendants repeatedly assured investors that cangrelor (1) was "on track" for a 2014 launch, (2) demonstrated superiority to clopidogrel, and (3) presented lower bleeding rates than clopidogrel, even though they knew that the Champion PHOENIX trial had been improperly skewed in favor of cangrelor, presenting a grave risk to its FDA approval. *Id.* ¶¶ 59–86.

Lead Plaintiff further alleges that investors were harmed (1) on February 10, 2014, when the FDA released Briefing Documents criticizing the cangrelor drug trial and (2) on February 12, 2014, when the FDA advisory panel voted to recommend against approving cangrelor for either of the two proposed indications. In response to these events, MDCO stock fell by more than 5% on February 10, 2014 and an additional 11.5% on February 13, 2014. *Id.* ¶¶ 87–98.

Ultimately, on April 30, 2014, the Company announced the FDA's decision not to approve cangrelor for either the PCI Indication or the Bridge Indication.

## III.   PROCEDURAL BACKGROUND AND SETTLEMENT TERMS

This action was commenced on February 21, 2014. On July 18, 2014, Warren Schuler was appointed Lead Plaintiff and Pomerantz LLP was appointed Lead Counsel. Lead Plaintiff filed the Corrected First Amended Complaint on September 17, 2014. Defendants moved to dismiss on November 17, 2014.

On June 22, 2015, after Defendants' motion to dismiss was fully briefed, the FDA approved cangrelor "as an adjunct to percutaneous coronary intervention (PCI) . . . in patients who have not been treated with a P2Y12 platelet inhibitor and are not being given a glycoprotein IIb/IIIa inhibitor" (the "Approved Indication"). [*See* ECF No. 53-2.]

On July 16, 2015, the Court heard oral argument on Defendants' motion to dismiss. At the conclusion of the argument, the Court recommended that the parties pursue mediation.

On November 2, 2015, during a full-day confidential mediation session with Jed Melnick, Esq., Lead Plaintiff and Settling Defendants reached an agreement to settle this Action, which they memorialized in a Memorandum of Understanding dated November 18, 2015 and a Stipulation of Settlement dated February 12, 2016.

5

Under the Settlement, Settling Defendants will cause $4.25 million (the "Settlement Amount") to be paid into an escrow account for the benefit of the Class. Lead Counsel believes that this immediate cash recovery provides a substantial benefit to the Class. Lead Counsel intend to request an award of up to 33% of the Settlement Fund in fees, up to $32,500 in expenses, and up to $3,500 as an award for Lead Plaintiff. The reasons for this request will be set forth in the papers to be filed in advance of the Final Approval Hearing.

The proposed Notice informs Class Members of all these matters and affords an opportunity to request exclusion from the class or object to any aspect of the Settlement, including the Plan of Allocation and the award of attorneys' fees and expenses. The Notice will be mailed to the address of each Class Member (as identified in MDCO's transfer records), as well as to institutional investors and banks and brokerage firms that usually maintain custodial accounts. A Publication Notice will be published on a national business newswire. A copy of the Notice, Publication Notice, Proof of Claim Form, and Stipulation of Settlement will also be posted on a website maintained by the Claims Administrator.

## IV.   THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL

A court may approve a proposed class-action settlement if it is "fair, reasonable, and adequate." *Krell v. Prudential Ins. Co. of Am. (in Re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions)*, 148 F.3d 283, 316 (3d Cir. 1998). There

6

is a "strong presumption in favor of voluntary settlement agreements," which is "especially strong in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594-95 (3d Cir. 2010) (citations omitted). Moreover, the Supreme Court has cautioned that in evaluating a proposed class-action settlement, courts should "not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981).

The three-step process for approval of a class action settlement is: (1) preliminary approval; (2) dissemination of notice of the settlement to the class; and (3) a settlement approval hearing where class members may be heard regarding the fairness, adequacy, and reasonableness of the settlement. *Manual for Complex Litigation (Fourth)* §§ 21.632–.634 (2004). At the preliminary-approval stage, the Third Circuit has instructed district courts to make only "a 'preliminary determination' on class-action certification for the purpose of issuing notice of settlement" and to "reserv[e] the issuance of a certification order until after a fairness hearing." *In re NFL Players Concussion Injury Litig.*, 775 F.3d 570, 586 (3d Cir. 2014). This approach "provides the flexibility needed to protect absent class members' interests and efficiently evaluate the issues of class certification and approval of a settlement agreement." *Id.*

At the Final Approval Hearing, the Court will have a full record and will be asked to make a determination as to whether the Settlement is fair, reasonable and adequate. At this juncture, Lead Plaintiff respectfully requests that the Court take the first step in the process and grant preliminary approval to the Settlement so that Class members may be notified.

## A.    The Proposed Settlement Merits Preliminary Approval

In deciding whether to grant preliminary approval, a court determines whether the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys, and whether it appears to fall within the range of possible approval. Under Rule 23, a settlement falls within the range of possible approval if there is a conceivable basis for presuming that the standard applied for final approval—fairness, adequacy, and reasonableness—will be satisfied. In making a preliminary determination, my first and primary concern is whether there are any obvious deficiencies that would cast doubt on the proposed settlement's fairness. I will also consider whether the negotiations occurred at arm's length, whether there was significant investigation of Plaintiffs' claims, and whether the proposed settlement provides preferential treatment to certain class members.

*Turner v. NFL (In re NFL Players' Concussion Injury Litig.)*, 301 F.R.D. 191, 197-98 (E.D. Pa. 2014) (collecting cases) (citations and quotation marks omitted), *appeal dismissed*, 775 F.3d 570 (3d Cir. 2014).

Here, all of the applicable considerations support granting preliminary approval. The proposed Settlement is the product of arm's-length negotiations among counsel with extensive experience in securities class-action litigation. The parties

8

negotiated with the assistance of an experienced mediator who recommended the $4,250,000 settlement amount. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("[A] . . . mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure."). There are no "obvious deficiencies," such as unduly preferential treatment towards certain class members. And although there has been no formal discovery, Lead Counsel conducted an extensive and thorough factual investigation while preparing the Amended Complaint and had the benefit of the detailed analyses contained in the FDA's Briefing Documents, particularly that of Dr. Thomas A. Marciniak, the Medical Team Leader. Lead Counsel also fully analyzed Defendants' arguments and defenses during the briefing of the motion to dismiss and the mediation process.

Lead Counsel thus understood the strengths and weaknesses of Lead Plaintiff's case and had an ample basis for making an informed judgment concerning the fairness of the settlement. *See In re Imprelis Herbicide Mktg.*, 296 F.R.D. 351, 364 (E.D. Pa. 2013) ("[B]ecause a settlement represents the result of a process by which opposing parties attempt to weigh and balance the factual and legal issues that neither side chooses to risk taking to final resolution, courts have given considerable weight to the views of experienced counsel as to the merits of a settlement.").

9

The settlement recovery also falls within the range of possible approval. MDCO's stock price fell 5% on February 10, 2014 (after the release of FDA Briefing Documents criticizing the cangrelor drug trial) and then 11.5% on February 13, 2014 (after the FDA advisory panel voted against approving cangrelor). Lead Plaintiff contends that a significant portion of these price drops was attributable to the revelation of fraud. However, if Defendants had never made the alleged misrepresentations, investors may have been less optimistic about cangrelor's chances, but they would not necessarily have known with certainty that the FDA advisory panel would vote against approving cangrelor. Moreover, the FDA panel vote may have revealed relatively little corrective information beyond that contained in the Briefing Documents released two days earlier. Therefore, a jury could find that the market's reaction to the FDA panel vote was primarily a response to the decreased likelihood of cangrelor's approval, rather than to the additional corrective information it provided.

Accordingly, assuming that 100% of the February 10, 2014 decline and 40% of the February 13, 2014 decline were attributable to the alleged fraud, and applying a constant-dollar institutional trading model, recoverable damages for the entire Class Period would be approximately $106.9 million for 33.6 million damaged shares. The $4.25 million settlement amount thus reflects approximately 4.0% of the estimated recoverable damages in this case, which is within the range of possi-

10

ble approval. *See, e.g., In re AT&T Corp. Secs. Litig*., 455 F.3d 160, 169 (3d Cir. 2006) (affirming settlement for 4% of total damages); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 319, 339 (W.D. Pa. 1997), *aff'd*, 166 F.3d 581 (3d Cir. 1999) (approving settlement for 5.35% of estimated damages, overruling objections, and collecting cases approving "class settlements involving far smaller percentage recoveries"); *cf.* Dr. Renzo Comoli & Svetlana Starykh, NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation: 2014 Full-Year Review* at 32 (Jan. 20, 2015), http://www.nera.com/content/dam/nera/publications/2015/ Full_Year_Trends_2014_0115.pdf (noting that, in securities class actions with $100-$200 million of investor losses, the median settlement between 1996 and 2014 was for 3.3% of investor losses).

### B.     The Proposed Settlement Merits a Presumption of Fairness

The Third Circuit has directed district courts to "apply an initial presumption of fairness when reviewing a proposed settlement where: (1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) (citation omitted).

Although the fourth factor cannot be addressed until notice is disseminated, the first three factors are met. As noted above, the proposed Settlement is the product of arm's-length negotiations, facilitated by an experienced mediator, among counsel with extensive experience in securities class-action litigation. And courts have frequently found informal discovery to be sufficient to support the fairness of a securities class-action settlement. *See Krell v. Prudential Ins. Co. of Am. (in Re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions)*, 148 F.3d 283, 319 (3d Cir. 1998) (affirming district court's conclusion that the "use of informal discovery was especially appropriate . . . because the Court stayed plaintiffs' right to formal discovery for many months, and because informal discovery could provide the information that plaintiffs needed" (internal quotation marks omitted)); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 267 (E.D. Pa. 2012) (applying presumption of fairness in part because "although no formal discovery was conducted . . . [class counsel] conducted informal discovery, including, *inter alia*, independently investigating the merits"); *Turner v. NFL (In re NFL Players' Concussion Injury Litig.)*, 307 F.R.D. 351, 390 (E.D. Pa. 2015) (same).

## C.    The Applicable *Girsh* Factors Support Preliminary Approval

While this analysis is premature, the proposed Settlement also fares well in light of the applicable factors used in evaluating class-action settlements for final approval. These factors include: "(1) the complexity, expense, and likely duration

of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotations and punctuation marks omitted); *accord City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).

Here, while Lead Plaintiff believes this case is strong, the "risk, expense, complexity, and likely duration of further litigation" were likely to be substantial. If the parties did not agree to settle, they would have faced an expensive litigation process with an uncertain outcome.

First, to defeat Defendants' motion to dismiss and thus obtain merits discovery, Lead Plaintiff would have to establish that Amended Complaint satisfies the pleading standards of the PSLRA—in particular, the requirement that its factual allegations support an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Lead Plaintiff believes the Amended Complaint is well-grounded in facts strongly suggesting scienter. Before Champion PHOENIX, Defendants knew that two earlier trials had shown that cangrelor was no more effective than a 600mg loading dose of clopidogrel. This gave them a strong motivation to design PHOENIX differently to tip the balance in cangrelor's favor. As Dr. Marciniak described:

> Two of the major differences between PCI and PHOENIX (the allowance of the 300mg loading dose and the greater delay in clopidogrel timing in PHOENIX) were discretionary changes that would be expected to increase the likelihood that the cangrelor regimen appears superior to the clopidogrel regimen—although not because of any superiority of cangrelor itself. The delay in clopidogrel loading is inappropriate particularly in view of the PLATFORM results.

Compl. ¶ 51. Yet Defendants described the PHOENIX results to investors as showing "statistically significant improvement as compared to clopidogrel," *id*. ¶ 51, without disclosing that the entirety of the "improvement" was due to the skewed administration of clopidogrel, which deviated from the protocol communicated to the FDA with respect to both timing (clopidogrel was to be administered "as soon as possible after randomization" but was in fact delayed) and loading dosage (according to the protocol, only a small number of patients would receive a 300mg loading dose, but in fact a large percentage of patients received this inferior dose). *See* Thomas A. Marciniak, M.D., Clinical Review of Cangrelor, *Ethicalness of the cangrelor development program* (Jan. 10, 2014) [ECF No. 31-29 at 62–65].

14

Lead Plaintiff believes that this cannot be explained away as a mere scientific disagreement about trial design or the appropriate loading dose of clopidogrel, as Defendants have argued.

Lead Plaintiff also alleged that the Individual Defendants sold substantial amounts of stock during the Class Period for almost $15 million in net profits, which suggests that they knew their statements to investors were misleading.

But while Lead Plaintiff believes he had strong arguments on scienter, there was no guarantee of prevailing against Defendants' motion to dismiss, particularly in light of the FDA's eventual approval of cangrelor for the Approved Indication.

Lead Plaintiff may also have needed to defeat Defendants' argument that investors were not deceived because the conduct of the cangrelor trials was fully disclosed in articles published in the American Heart Journal and the New England Journal of Medicine. Lead Plaintiff contends that such an argument is not appropriate for a motion to dismiss because it is a "truth-on-the-market defense," which "is intensely fact-specific and is rarely an appropriate basis for dismissing a Section 10(b) complaint for failure to plead materiality." *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Plaintiff also have argued that neither article fully disclosed the true facts. The American Heart Journal article described the trial design prospectively but did not explain how the trials were actually conducted. *Rationale and Design of the Cangrelor Versus Standard Therapy to Achieve Opti-*

15

*mal Management of Platelet Inhibition PHOENIX trial*, 163 Am. Heart J. 768-776e.2 (May 2012) [ECF No. 31-7]. Meanwhile, the New England Journal of Medicine article itself perpetuated the misrepresentations, stating:

> There was no significant difference in the effect of cangrelor on the primary end point between patients who received the loading dose immediately before PCI . . . and those who received it during or after PCI . . . Similarly, there was no significant difference in the effect of cangrelor on the primary end point between patients who received a 600-mg loading dose of clopidogrel (74.4% of the population) and those who received a 300-mg loading dose (25.6% of the population).

*Effect of Platelet Inhibition with Cangrelor During PCI on Ischemic Events,* 368 N. Engl. J. Med. 1303-13 (Apr. 4, 2013) [ECF No. 31-16 at 7]. And Defendants assured investors the very next day that "the dose and timing of clopidogrel comparator did not confound the study. Cangrelor was more effective than clopidogrel *given at any dose or at any time*." Compl. ¶ 70. Thus, even assuming Defendants fully disclosed the differential in loading doses, they simultaneously made misleading statements to counter any suspicion that the imbalanced loading dosages and timing affected cangrelor's effectiveness. Lead Plaintiff believes that these are strong arguments, but, as with scienter, there was no assurance of prevailing.

Further, if the action proceeded through class certification and trial, Lead Plaintiff would have faced substantial additional obstacles at each step. In particular, with respect to loss causation and damages, Lead Plaintiff would have the very difficult task of proving which portion of the stock drop was related to the fraud as

16

opposed to the fact of the FDA panel's vote against cangrelor, which investors may not necessarily have expected with certainty even if they had known the full truth. And in any securities case, proving scienter is notoriously difficult. *See In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 426 (S.D.N.Y. 2001); *In re Sturm, Ruger, & Co., Inc. Sec. Litig.*, 3:09-CV-1293 VLB, 2012 WL 3589610, at *6 (D. Conn. Aug. 20, 2012). Although Lead Plaintiff is confident in his claims, it is possible that a jury would find that Defendants' conduct amounted to misman-agement and negligence, and did not rise to the level of recklessness required for liability under the federal securities laws.

## V.   CERTIFICATION OF THE CLASS IS APPROPRIATE

The parties have stipulated to the certification, for settlement purposes only, of the following Rule 23(b)(3) class:

> All persons who purchased or otherwise acquired MDCO securities between January 8, 2013 and February 12, 2014, both dates inclusive. Excluded from the Class are Defendants; the officers and directors of the Company at all relevant times; members of the immediate families of each Defendant; any person or entity in which any Defendant has a controlling interest or which is related to or affiliated with any De-fendant; and the legal representatives, agents, heirs, successors or as-signs of any such excluded party. Also excluded from the Class are those Persons who request exclusion from the Class in such form and manner, and within such time, as the Court shall prescribe.

### A.   The Proposed Settlement Class Satisfies Rule 23(a)

To be certified under Rule 23(b)(3), a proposed class must satisfy the four elements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of rep-

17

resentation) and the two elements of Rule 23(b)(3) (predominance and superiority). Fed. R. Civ. P. 23(a), (b)(3). As is often the case in securities class actions, the four elements of Rule 23(a) are easily satisfied.

First, numerosity is satisfied. Courts generally assume that the numerosity requirement is met in cases involving nationally-traded securities. Indeed, "numerosity is presumed at a level of 40 members." *Consolidated Raid Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Here, Lead Counsel's damages expert estimates that 33.6 million shares of MDCO common stock were damaged by Defendants' alleged misconduct during the Class Period. This suggests that there may be thousands of class members.

Second, commonality is satisfied. The following questions of law and fact are common to the Class: (1) whether Defendants made false and misleading statements concerning cangrelor's superiority over clopidogrel and the design and results of Champion PHOENIX; (2) whether Defendants acted knowingly or recklessly in issuing the alleged false and misleading statements; and (3) whether the price of MDCO securities during the Class Period were artificially inflated because of the alleged misconduct.

Third, Lead Plaintiff's claims are typical of the Class's claims. Lead Plaintiff's claims arise out of the same course of conduct, involve the same legal theories, do not raise divergent goals or interests, and are capable of class-wide resolu-

18

tion. There is no evidence that Lead Plaintiff stands in any different posture than, or has any conflicting position with, any other Class member. All Members of the Class were victims of this common course of conduct by Defendants. As a result, the claims of the Lead Plaintiff are typical of those of the Class.

Fourth, adequacy is satisfied. Courts have established a two-prong test for this requirement: "(1) whether the representatives' interests conflict with those of the class and (2) whether the class attorney is capable of representing the class." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 185 (3d Cir. 2001). Both prongs are met here. There are no conflicts because Lead Plaintiff has the same claims as the members of the Class he seeks to represent. Lead Counsel has successfully prosecuted numerous securities class actions on behalf of investors across the country and has successfully secured this Settlement for the proposed Class. Accordingly, the interests of the Class will be fairly and adequately protected.

## B.     The Proposed Settlement Class Satisfies Rule 23(b)

Rule 23(b)(3) requires that issues common to the class predominate over individualized issues and that a class action be superior to other methods of adjudication. In evaluating these factors in the settlement context, the Court need not consider whether the action would present intractable trial management problems be-

cause "the proposal is that there be no trial." *Amchem Prods. v. Windsor*, 521 U.S.

591, 620 (1997); *see also* Fed. R. Civ. P. 23(b)(3)(D).

Predominance is satisfied under the fraud-on-the-market theory, which creates a class-wide presumption of reliance. This presumption requires four elements: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2408 (2014) (citation omitted). These elements are met here: (1) the alleged misrepresentations were in SEC filings and public presentations; (2) they concerned the efficacy of the Company's new drug, which was once expected to generate up to $400 million in annual sales; (3) MDCO securities traded on NASDAQ; and (4) Class members, by definition, purchased or acquired MDCO securities during the Class Period.

Superiority is easily satisfied as well. If not for a class action, each Class member would need to litigate the same factual and legal issues individually.

## VI.   THE PROPOSED FORM AND METHOD OF NOTICE IS APPROPRIATE

The parties have negotiated the form of a Notice of Proposed Settlement of Class Action, Motion for Attorneys' Fees and Expenses, and Settlement Fairness Hearing (the "Notice") to be disseminated to the Class to notify them of the terms

584655.1

of the Settlement and of their rights in connection therewith, as well as a Notice of Pendency and Settlement of Class Action (the "Publication Notice") to be published on a national business newswire. The Notice and Publication Notice have been drafted to comply with the provisions of the Private Securities Litigation Reform Act. *See* 15 U.S.C. §78u-4(a)(7).

The Notice will be sent by first-class mail to all Class members who can be identified with reasonable effort to inform them of the terms of the Settlement, their rights in connection with the Settlement, and the date of the Final Approval Hearing, where the Court will consider final approval of the Settlement and attorneys' fees and expenses. The Claims Administrator will make additional copies of the Notice available to nominee holders such as brokerage firms who held Company stock during the Class Period. Such nominee holders will be requested to forward copies of the Notice to all beneficial owners of such shares or, alternatively, to provide the Claims Administrator with a list of the names and addresses of such beneficial owners so that the Claims Administrator can mail the Notice to such beneficial owners directly.

The Parties believe that Notice by first-class mail, combined with Publication Notice in a major publication and on the claims administrator's website, is the best notice practicable under the circumstances, is typical of the notice given in other class actions, and satisfies the requirements of Rule 23 of the Federal Rules

21

of Civil Procedure and due process. *See, e.g., In re Marsh Erisa Litig.*, 265 F.R.D. 128, 145 (S.D.N.Y. 2010); *see also Mangone v. First USA Bank*, 206 F.R.D. 222, 231-232 (S.D. Ill. 2001) (approving mailed notice to last known addresses of a Settlement Class with nearly 18.5 million members). Objecting parties can submit an objection in opposition to any aspect of the Settlement and can appear at the Final Approval Hearing to present their arguments. This Court should find that the Notice, Publication Notice, and the procedures for dissemination are reasonably calculated to provide notice of the Settlement to the Class.

## VII.   PROPOSED SCHEDULE OF EVENTS

Lead Plaintiff proposes the following schedule:

| | |
|---|---|
| Notice mailed to Class | Forty (40) days after entry of Preliminary Approval Order |
| Deadline for papers in support of Settlement, Fee and Expense Award, and Compensatory Award | Twenty-eight (28) days before Final Approval Hearing |
| Objection Deadline | Twenty-one (21) days before Final Approval Hearing |
| Opt-Out Deadline | Twenty-one (21) days before Final Approval Hearing |
| Deadline for responses to objections and other reply papers in support of Settlement | Seven (7) days before Final Approval Hearing |
| Final Approval Hearing | Within one hundred and twenty (120) days after entry of Preliminary Approval Order |
| Deadline to file Proofs of Claim | Postmarked within five (5) days after the Final Approval Hearing |

584655.1

## VIII.  CONCLUSION

For all of the foregoing reasons, Lead Plaintiff respectfully requests the

Court to preliminarily approve the proposed Settlement and enter a Preliminary

Approval Order substantially in the form attached to the Notice of Motion.


Dated: February 19, 2016                 Respectfully submitted,
                                         **LITE DEPALMA GREENBERG, LLC**

                                         */s/ Bruce D. Greenberg*
                                         Bruce D. Greenberg
                                         570 Broad Street, Suite 1201
                                         Newark, NJ 07102
                                         (973) 623-3000

                                         **POMERANTZ LLP**
                                         Jeremy A. Lieberman
                                         Murielle J. Steven Walsh
                                         Aatif Iqbal
                                         600 Third Avenue, 20th Floor
                                         New York, NY 10016
                                         (212) 661-1100

                                         *Attorneys for Lead Plaintiff*

584655.1