**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| WARREN H. SCHULER, individually and on behalf of other persons similarly situated,<br><br>                                         Plaintiff,<br><br>v.<br><br>THE MEDICINES COMPANY, et al.,<br><br>                                         Defendant. | Civil Action No.: 14-1149 (CCC)<br><br><br><br><br><br>**OPINION** |

**CECCHI, District Judge.**

## I.    INTRODUCTION

Plaintiff Warren H. Schuler ("Lead Plaintiff") brings this action on behalf of himself and all other similarly situated individuals (collectively, "Plaintiffs") against Defendants the Medicines Company ("MDCO"), Clive A. Meanwell, Paul M. Antinori, and Glenn P. Sblendorio (collectively, the "Individual Defendants" and, together with MDCO, "Defendants") for violation of federal securities laws.  ECF No. 1.  On February 25, 2016, the Court granted preliminary certification of the settlement class and collective action and preliminarily approved the settlement. ECF No. 59.  Presently before the Court are Plaintiffs' unopposed motions for final approval of the settlement and for an award of attorneys' fees.  ECF Nos. 65, 66.  The Court held a final fairness hearing on June 7, 2016.  ECF No. 69.  For the reasons that follow, the Court grants final certification of the settlement class and collective action, approves the settlement agreement, awards litigation costs and expenses, and dismisses this action with prejudice.

## II.   BACKGROUND

### A.   Summary of Factual Allegations

Lead Plaintiff brings this action on behalf of investors who purchased the securities of MDCO between January 8, 2013 and February 12, 2014 (the "Class Period"). See Corrected First Amended Class Action Complaint ("Compl." or "Complaint"), ECF No. 28, ¶ 1.   MDCO is a pharmaceutical company that focuses on acute cardiovascular care, surgery and perioperative care, and serious infectious disease care.   During the Class Period, one of its most promising products in development was cangrelor, an anti-platelet blood thinner that was once expected to generate up to $450 million in annual sales. Id. ¶¶ 27-29. Lead Plaintiff alleges that Defendants knowingly or recklessly made materially false and misleading misstatements about cangrelor and the results of clinical trials MDCO conducted for cangrelor. Id. ¶¶ 59-86. The Complaint further alleges that investors were harmed when the Food and Drug Administration ("FDA") criticized the cangrelor drug trial and ultimately recommended against approving cangrelor for its proposed indications, causing the value of MDCO stock to fall. Id. ¶¶ 87-98.

### B.   Procedural History

On February 21, 2014, Plaintiff David Serr commenced a securities class action against Defendants.[1] ECF No. 1. On July 18, 2014, the Court appointed Warren Schuler as Lead Plaintiff, Pomerantz LLP as Lead Counsel, and Lite DePalma Greenberg, LLC, as liaison counsel. ECF

---

[1] Although this action was initially commenced with David Serr as the named plaintiff, on May 6, 2014, Warren Schuler moved to be appointed as lead Plaintiff, with no opposition. ECF No. 22.

2

No. 26. On September 17, 2014, Lead Plaintiff filed a corrected First Amended Complaint against Defendants, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b), Section 20(a) of the Act, 15 U.S.C. § 78t(a), and Securities and Exchange Commission Rule 10b–5, 17 CFR § 240.10b–5 (2013). See Compl. ¶¶ 122-138.

On November 17, 2014, Defendants moved to dismiss the Complaint. ECF No. 31. On June 22, 2015, after Defendants' motion to dismiss was fully briefed, the FDA approved cangrelor for one indication. See ECF No. 58 Ex. A at 2. On July 16, 2015, the Court heard oral argument on Defendants' motion to dismiss and recommended that the parties pursue mediation. See ECF Nos. 55, 66-1 at 8. After a full-day mediation on November 2, 2015, the parties reached an agreement to settle this matter. See ECF No. 66-1 at 8.

On February 25, 2016, the Court issued an order granting: (1) preliminary approval of the parties' settlement (the "Settlement"); and (2) preliminary certification of a settlement class consisting of "[a]ll persons who purchased or otherwise acquired the securities of . . . MDCO between January 8, 2013 and February 12, 2014." ECF No. 59 ¶¶ 1-2. The Court further ordered Lead Counsel or the Claims Administrator to use reasonable efforts to cause a copy of the Notice of Proposed Settlement, Motion for Attorneys' Fees and Expenses, Settlement Fairness Hearing, and the Proof of Claim and Release forms to be mailed to all Class Members by no later than April 5, 2016. See id. ¶ 4(b).

By May 31, 2016, Lead Counsel mailed 37,488 Notice Packets to potential Class Members. Supplemental Declaration of Ryan Kao ("Supp'l Kao Decl."), ECF No. 68-4, ¶ 3. In addition, the Claims Administrator published the Summary Notice in Investor's Business Daily and over PR Newswire and maintained a website and a toll-free telephone number dedicated to this Settlement.

Declaration of Ryan Kao ("Kao Decl."), ECF No. 65-3, ¶¶ 10-12. Class Members who wished to be excluded from the Class were required to submit a request in writing no later than May 17, 2016. Supp'l Kao Decl. ¶ 5. Lead Counsel have received no requests for exclusion or objections to the Settlement. Id.; see also Tr.[2] 3:2-5, 4:9-10.

C.     **Terms of the Settlement Agreement**

The Settlement Agreement provides that Defendants will pay $4,250,000 ("Settlement Amount") into an escrow account for the benefit of the Class. See ECF No. 58, Ex. A ¶ 2.0. The Settlement Amount is inclusive of all payments to Class Members as well as to Lead Counsel and Lead Plaintiff.

Lead Counsel seeks an award of $1,402,500[3] in attorneys' fees, which represents 33% percent of the common fund created by the Settlement Agreement, and an award of $33,569.20 in expenses incurred while prosecuting this litigation. In addition, Lead Plaintiff requests an award in the amount of $3,500 to compensate him for his time and service to the Class. To date, there have been no objections to the forgoing requests for litigation fees and expenses.

III.     **CLASS CERTIFICATION**

Federal Rule of Civil Procedure 23 requires the Court to engage in a two-step analysis to determine whether to certify a class action for settlement purposes. First, the Court must determine

---

[2] "Tr." refers to the transcript of the Final Fairness Hearing held on June 7, 2016.
[3] Plaintiffs' Motion for Award of Attorneys' Fees and Expenses and Lead Plaintiff Award initially stated that 33% of the Settlement Amount equaled $1,141,666.67. See ECF No. 70. Plaintiffs have since clarified that 33% of the Settlement Amount is in fact $1,402,500. Id. This error was purely typographical. Moreover, as the notice to Class Members stated merely that Lead Counsel would seek "fees up to 33% of the Settlement Amount," see ECF No. 28 Ex. C at 2, this adjustment is of no consequence and could not have caused confusion to the Class Members.

whether Plaintiffs have satisfied the prerequisites for maintaining a class action as set forth in Rule 23(a). Second, if Plaintiffs can satisfy these prerequisites, the Court must then determine whether the requirements of Rule 23(b) are met. See Fed. R. Civ. P. 23(a) advisory committee's note.

### A. Rule 23(a) Requirements

For a lawsuit to be maintained as a class action, four prerequisites must be met: (1) numerosity: the class is so numerous that joinder of all members is impracticable; (2) commonality: there are questions of law or fact that are common to the class; (3) typicality: the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) adequacy of representation: the representative parties will fairly and adequately protect the interests of the class. See Fed. R. Civ. P. 23(a).

### i. Numerosity

There is no minimum number of individuals necessary for certification of a class, and a prospective class that includes over forty members will generally satisfy the numerosity requirement. See Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001); Eisenberg v. Gagnon, 766 F.2d 770, 785-86 (3d Cir. 1985). As of June 7, 2013, 148 claims were fully processed. Tr. 4:16-22. In addition, Lead Counsel's damages expert estimates that 33.6 million shares of MDCO common stock were affected by Defendants' alleged misconduct during the Class Period, suggesting that there may be thousands of potential class members. See Pl. Br. in Support of Final Approval of Class Settlement, ECF No. 66-1, at 26. Defendants do not contest that estimate. Accordingly, the Court finds that the numerosity requirement is satisfied.

### ii. Commonality

Next, Plaintiffs must demonstrate that there are questions of fact or law common to the

class to satisfy the commonality requirement. Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (quoting Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 157 (1982)). "Their claims must depend upon a common contention" such that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id.

Here, the questions common to the Class include: (1) whether Defendants made misrepresentations concerning cangrelor and the clinical trial; (2) whether Defendants acted knowingly or recklessly in issuing the alleged false and misleading statements; and (3) whether the price of MDCO securities during the Class Period was artificially inflated by Defendants' misconduct. These questions are common to all Class Members. Accordingly, the Court finds that the commonality requirement is satisfied.

### iii.      Typicality

Third, Rule 23(a)(3) requires that a representative plaintiff's claims be "typical of the claims . . . of the class. The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." Barnes v. Am. Tobacco Co., 161 F.3d 127, 141 (3d Cir. 1998) (citation omitted). As with numerosity, the Third Circuit has "set a low threshold for satisfying" typicality, stating that "[i]f the claims of the named plaintiffs and putative Class Members involve the same conduct by the defendant, typicality is established . . . ." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183-84 (3d Cir. 2001); see also Baby Neal v. Casey, 43 F.3d 48, 58 (3d Cir. 1994). The typicality requirement "does not mandate that all putative Class Members

share identical claims." Newton, 259 F.3d at 184 (citation omitted); see also Hassine v. Jeffes, 846 F.2d 169, 176-77 (3d Cir. 1988).

Here, the claims made by the Lead Plaintiff and those made on behalf of the other Class Members arise out of a common course of conduct by Defendants, involve the same legal theories, and are capable of class-wide resolution. Further, there is no evidence that Lead Plaintiff's claims are materially different than those of any other Class Member. See, e.g., In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 342 (3d Cir. 2010) (affirming the District Court's certification of the settlement class where "the claims of the class representatives [were] aligned with those of the Class Members since the claims of the representatives ar[o]se out of the same conduct and core facts"). Thus, the typicality requirement is also satisfied.

### iv.     Adequacy of Representation

Finally, when making an adequacy determination, the Court must consider (1) the qualifications, experience, and general abilities of the plaintiffs' lawyers to conduct the litigation; and (2) whether the interests of the lead plaintiffs are sufficiently aligned with the interests of the absentees. See In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004); In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 800 (3d Cir. 1995). Here, Lead Counsel has extensive experience litigating complex securities class actions and obtaining class action settlements. See Declaration of Murielle J. Steven Walsh in Support of Final Approval of Settlement, Plan of Allocation, and Awards to Lead Counsel and Lead Plaintiff, ("Walsh Decl."), ECF No. 66-2, ¶ 2. Further, there is no indication that Lead Plaintiff's interests are antagonistic to those of the class. Consequently, the adequacy requirement is met.

### B.     Rule 23(b)(3) Requirements

The Court must next consider whether this class action comports with the requirements of Rule 23(b)(3). Under Rule 23(b)(3), the Court must find that "the questions of law or fact common to Class Members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). For the reasons set forth below, the Court finds that this class action meets the predominance and superiority requirements.

### i.      Predominance

To satisfy the predominance requirement, parties must do more than merely demonstrate a "common interest in a fair compromise;" rather, they must provide evidence that the proposed class is "sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997); see also Sullivan v. DB Invs., Inc., 667 F.3d 273, 297 (3d Cir. 2011) (noting that the predominance requirement is "more stringent" than the Rule 23(a) commonality requirement). For the reasons set forth below, the Court finds that the predominance requirement is satisfied.

### a.   Section 10(b) and Rule 10b–5 Claims

Here, all of Plaintiffs' Section 10(b) and Rule 10b–5 claims involve common questions of law or fact. In general, to succeed on Section 10(b) and Rule 10b–5 claim, a plaintiff must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1192 (2013). "'[T]he questions of whether Defendants' statements or omissions were material, whether they were made in connection with

the purchase or sale of securities, and whether they were made with scienter, are necessarily common to each class member given that Defendants' conduct alone is relevant to their proof.'" In re NeuStar, Inc. Sec. Litig., 2015 WL 5674798, at *6 (E.D. Va. Sept. 23, 2015) (quoting Menkes v. Stolt-Nielsen S.A., 270 F.R.D. 80, 91 (D. Conn. 2010)). "Additionally, class members would prove loss causation through common evidence like event studies, expert testimony, or other evidence demonstrating that the 'misrepresentation or omission was one substantial cause of the investment's decline in value.'" Id. (quoting Katyle v. Penn Nat. Gaming, Inc., 637 F.3d 462, 472 (4th Cir. 2011)).

Finally, a presumption of class-wide reliance is created where the plaintiff makes the following showings: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." Halliburton Co. v. Erica P. John Fund, Inc., 134 S.Ct. 2398, 2408 (2014) (citation omitted). Here, Plaintiffs can show that: (1) the alleged misrepresentations were in SEC filings and public presentations; (2) they concerned the efficacy of the Company's new drug, which was once expected to generate up millions in annual sales; (3) MDCO securities traded on NASDAQ; and (4) Class members, by definition, purchased or acquired MDCO securities during the Class Period. Accordingly, the Court finds that the common questions of law or fact underlying Plaintiffs' Section 10(b) and Rule 10b–5 claims predominate over questions affecting only individual Class Members.

### b. Section 20(a) Claims

To prove a violation of Section 20(a), a "plaintiff must prove that one person controlled

9

another person or entity and that the controlled person or entity committed a primary violation of the securities laws." In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 284 (3d Cir. 2006). Here, each Class Member's Section 20(a) claim "should be identical given that [the Individual] Defendants' conduct alone is relevant to satisfying the applicable standard, and given that each [C]lass [M]ember's claim arises from the same statements made by [the Individual] Defendants." Menkes, 270 F.R.D. at 91.  Thus, Plaintiff's Section 20(a) claims also satisfy the predominance requirement.

### ii. Superiority

To satisfy the superiority requirement, the Court must "balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996) (citing Katz v. Carte Blanche Corp., 496 F.2d 747, 757 (3d Cir. 1974) (en banc)).  Factors relevant to this Court's superiority analysis include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 185 (3d Cir. 2001) (citing Fed. R. Civ. P. 23(b)). In addition, "[c]lass actions have been held to be especially appropriate where 'it would be economically infeasible for [individual Class Members] to proceed individually.'" Id. (quoting Stephenson v. Bell Atl. Corp., 177 F.R.D. 279, 289 (D.N.J. 1997)).

For the following reasons, the Court finds that this class action satisfies the superiority requirement.  First, the record in this case does not indicate an interest among Class Members in

individually controlling the prosecution of separate actions. As stated above, no Class Member has requested exclusion from the class action. This suggests a lack of interest in pursuing claims individually. Second, the parties do not dispute that this Court is an appropriate forum for the lawsuit. Moreover, "[t]o litigate the individual claims of even a tiny fraction of the potential Class Members would place a heavy burden on the judicial system and require unnecessary duplication of effort by all parties." Henderson v. Volvo Cars of N. Am., LLC, Civ. No. 09-4146(CCC), 2013 WL 1192479, at *6 (D.N.J. Mar. 22, 2013). By contrast, nothing in the record indicates that the litigation of Plaintiffs' claims as a class action would be unmanageable. Thus, the superiority requirement is satisfied.

## IV.   FINAL APPROVAL OF THE SETTLEMENT

Having certified the proposed class action under Rule 23, the Court must evaluate the fairness of the Settlement pursuant to Rule 23(e). Under Rule 23(e), approval of a class settlement is warranted only if the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Acting as a fiduciary responsible for protecting the rights of absent class members, the Court is required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." In re Cendant Corp. Litig., 264 F.3d 201, 231 (3d Cir. 2001) (quoting Gen. Motors Corp., 55 F.3d at 785). This determination rests within the sound discretion of the Court. Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975). In Girsh, the Third Circuit identified nine factors to be used in the approval determination:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks of
> establishing liability; (5) the risks of establishing damages; (6) the

> risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Id. at 157 (internal quotation marks, alterations, and citation omitted).

Additionally, a presumption of fairness exists where a settlement has been negotiated at arm's length, discovery is sufficient, the settlement proponents are experienced in similar matters, and there are few objectors. Warfarin, 391 F.3d at 535. Finally, settlement of litigation is especially favored by courts in the class-action setting. "The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." Gen. Motors Corp., 55 F.3d at 784; see also Warfarin, 391 F.3d at 535 (explaining that "there is an overriding public interest in settling class action litigation, and it should therefore be encouraged"). Turning to each of the Girsh factors, the Court finds as follows:

### A.    Complexity, Expense, and Likely Duration of the Litigation

The first factor is intended to capture "the probable costs, in both time and money, of continued litigation." Gen. Motors Corp., 55 F.3d at 812 (internal quotations and citation omitted). Here, the "risk, expense, complexity, and likely duration of further litigation" were likely to be substantial. This case is extremely factually complex and would have been expensive and time-consuming to litigate, requiring expert testimony about biochemistry and clinical medical practice regarding blood thinners and loading doses, FDA clinical drug trials, and the significance of the indication for which a drug is approved, among other issues. By reaching a settlement, the parties have avoided the significant expenses connected with these issues and provided immediate and substantial benefits for the settlement class. Thus, this factor weighs in favor of approval.

12

### B.      Reaction of the Class to the Settlement

This second factor "attempts to gauge whether members of the class support the
settlement." In re Lucent Techs., Inc., Sec. Litig., 307 F. Supp. 2d 633, 643 (D.N.J. 2004) (internal
quotation marks and citation omitted).  The Third Circuit has found that "[t]he vast disparity
between the number of potential Class Members who received notice of the Settlement and the
number of objectors creates a strong presumption that this factor weighs in favor of the
Settlement." Cendant Corp., 264 F.3d at 235.  Here, the Court has received no timely objections
to the Settlement.  Therefore, this factor weighs in favor of approval.

### C.      The Stage of the Proceedings and the Amount of Discovery Completed

Third, the Court considers the stage of the proceedings and the amount of discovery
completed in order to evaluate the degree of case development that Lead Counsel has
accomplished prior to settlement.  "Through this lens, courts can determine whether counsel had
an adequate appreciation of the merits of the case before negotiating." Cendant Corp., 264 F.3d
at 235 (quoting Gen. Motors Corp., 55 F.3d at 813).  "Generally, post-discovery settlements are
viewed as more likely to reflect the true value of a claim as discovery allows both sides to gain
an appreciation of the potential liability and the likelihood of success." In re Auto. Refinishing
Paint Antitrust Litig., 617 F. Supp. 2d 336, 342 (E.D. Pa. 2007) (citing Bell Atl. Corp. v. Bolger,
2 F.3d 1304, 1314 (3d Cir. 1993)).

Although there has been no formal discovery, Lead Counsel had ample information to
evaluate the prospects for the Class and to assess the fairness of the Settlement.  Prior to
settlement, Lead Counsel: (1) reviewed and analyzed public filings, annual reports, press
releases, quarterly-earnings-call and industry-conference transcripts, and other public statements;

(2) conducted extensive investigation and analysis of publicly available scientific literature, data, presentations, and other relevant materials, including the detailed analyses contained in the FDA's briefing documents; (3) reviewed and analyzed stock trading data relating to MDCO as well as reports by major financial news services and analysts; (4) consulted with an FDA expert; (5) investigated biochemical, pharmaceutical, and medical company practices with respect to the process of seeking FDA approval of new drugs and devices; (6) researched the FDA's rules and procedures; (7) drafted the initial complaint and the detailed Corrected First Amended Class Action Complaint to comply with the Private Securities Litigation Reform Act of 1995 ("PSLRA") and to include highly technical allegations regarding the FDA and the new drug application process, as well as pharmaceutical industry-specific allegations; (8) researched and drafted an opposition to Defendants' motion to dismiss; (9) prepared for and attended an oral argument on Defendants' motion to dismiss; and (10) prepared for and engaged in a mediation, including drafting a mediation statement.  Accordingly, the Court is satisfied that, by the time the parties reached a settlement, Lead Counsel "had developed enough information about the case to appreciate sufficiently the value of the claims." In re Nat'l Football League Players Concussion Injury Litig., No. 15-2206, 2016 WL 1552205, at *19 (3d Cir. Apr. 18, 2016) (affirming district court's determination that the third Girsh factor was satisfied where the parties had engaged in informal discovery and ten months of settlement discussions).  Therefore, this factor weighs in favor of approval.

### D.    Risks of Establishing Liability

Fourth, the risks of establishing liability should be considered to "examine what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate

the claims rather than settle them." Cendant Corp., 264 F.3d at 237 (quoting Gen. Motors Corp., 55 F.3d at 814). "The inquiry requires a balancing of the likelihood of success if 'the case were taken to trial against the benefits of immediate settlement.'" In re Safety Components Int'l, Inc. Sec. Litig., 166 F. Supp. 2d 72, 89 (D.N.J. 2001) (quoting In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)).

Here, Lead Counsel faced several significant obstacles to establishing liability. Investigating and proving liability would have required considerable and expensive consultation with experts in biochemistry, clinical medical practice, and the substantive and procedural law of FDA new drug applications. In addition, proving scienter would have required Lead Counsel to educate a jury about running a clinical trial and interpreting and portraying trial results, primarily through highly technical expert testimony and circumstantial evidence. See In re AT&T Corp. Secs. Litig., 455 F.3d 160, 170 (3d Cir. 2006) (emphasizing that "the difficulty of proving actual knowledge under §10(b) of the Securities Exchange Act . . . weighed in favor of approval of the fee request" (citation omitted)). In contrast, the Settlement provides immediate and certain recovery for the Class Members. In light of the uncertainty of success at trial and the certain, immediate benefit provided by the Settlement, this factor weighs in favor of approval.

E.    **Risks of Establishing Damages**

This fifth factor, like the factor before it, "attempts to measure the expected value of litigating the action rather than settling it at the current time." Cendant Corp., 264 F.3d at 238 (quoting Gen. Motors Corp., 55 F.3d at 816). Here, establishing loss causation and damages at trial would have required Lead Counsel to disentangle the market's reaction to various contemporaneous news items, similarly requiring expensive testimony by financial economics

experts using complex methodologies that are highly contested within the field. "In this 'battle of experts,' it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions." In re Warner Commc'ns Sec. Litig., 618 F. Supp. 735, 744–45 (S.D.N.Y. 1985). The Court agrees that Plaintiffs faced significant risks in establishing damages. Thus, this factor weighs in favor of approval.

### F.   Risks of Maintaining Class Action Status through Trial

Although the continued significance of this sixth factor in the settlement-only context is unclear, see Prudential, 148 F.3d at 321, the Court nonetheless finds that this factor weighs in favor of approval. The Court may, at any time before final judgment, decide to decertify a class if the class proves to be unmanageable. Fed. R. Civ. P. 23(c)(1)(C). Defendants may choose to challenge the certification of a litigation class if the case were to move forward. Thus, because there are significant risks in maintaining class certification, the Court finds that this factor weighs in favor of settlement approval.

### G.   The Settling Defendant's Ability to Withstand a Greater Judgment

The seventh factor examines whether Defendants "could withstand a judgment for an amount significantly greater than the settlement." Cendant Corp., 264 F.3d at 240. This factor weighs in favor of settlement. As discussed above, Lead Counsel has determined that settlement is appropriate in light of the significant risks in proving liability. Moreover, even if Defendants had the ability to pay more, it does not mean that they would be required to pay more following a trial. See Warfarin, 391 F.3d at 538 (noting that "the fact that [defendant] could afford to pay more does not mean that it is obligated to pay any more than what the . . . class members are entitled to

under the theories of liability that existed at the time the settlement was reached"). Thus, this factor weighs in favor of approval.

## H.    The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The eighth and ninth factors, concerning the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation, also weigh in favor of approval.

> The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. The percentage recovery, rather[,] must represent a material percentage recovery to plaintiff in light of all the risks considered under Girsh.

In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235, 263 (D.N.J. 2000) (internal quotation marks and citation omitted). Here, Lead Counsel represents that the Settlement Amount reflects approximately 4.0% of the estimated recoverable damages in this case. See ECF No. 66-1 at 23. This percentage falls squarely within the range of previous settlement approvals. See, e.g., In re AT&T, 455 F.3d at 169 (affirming settlement for 4% of total damages). Moreover, the Settlement Amount is the product of an arm's-length transaction by experienced counsel and facilitated by an experienced mediator. Accordingly, the Settlement is presumed to be fair and reasonable. See Warfarin, 391 F.3d at 534.

Therefore, the nine Girsh factors weigh in favor of approval. In addition, as discussed above, the settlement agreement was reached after arm's-length negotiations between counsel and after completion of, and access to, a significant amount of research, investigation, and analysis. Thus, the Settlement represents a fair, reasonable, and adequate result for the settlement class

considering the substantial risks Plaintiffs face and the immediate benefits provided by the Settlement.  See Reibstein v. Rite Aid Corp., 761 F. Supp. 2d 241, 255-56 (E.D. Pa. 2011).

## V.   ATTORNEYS' FEES AND EXPENSES AND LEAD PLAINTIFF AWARD

Finally, having found that final certification of the Class for settlement purposes is warranted and that the Settlement is fair and reasonable, the Court turns to Plaintiffs' request for litigation fees and expenses.  Under the common fund doctrine, "a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees."  In re Diet Drugs (Phentermine/ Fenfluramine/ Dexfenfluramine) Prod. Liab. Litig., 582 F.3d 524, 540 (3d Cir. 2009) (citations omitted).  This ensures that "competent counsel continue to be willing to undertake risky, complex, and novel litigation." Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 198 (3d Cir. 2000) (citation omitted).  In addition, counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." Safety Components, Inc, 166 F. Supp. 2d at 108 (citing Abrams v. Lightolier, Inc., 50 F.3d 1204, 1225 (3d Cir. 1995)).  For the reasons set forth below, this Court grants the requested awards.

### A.   Attorneys' Fees

Here, Lead Counsel seeks an award of $1,402,500 in attorneys' fees, which represents 33% of the common fund created by the Settlement.  When calculating attorneys' fees in common-fund cases such as this one, the percentage-of-recovery method is generally favored.  See In re Diet Drugs, 582 F.3d at 540 (citation omitted).  Nevertheless, the Third Circuit has suggested that, in addition to the percentage-of-recovery approach, district courts should "cross-check" the

percentage fee award against the "lodestar" method.  In re Rite Aid Corp. Sec. Litig., 396 F.3d

294, 305 (3d Cir. 2005) (citing Prudential, 148 F.3d at 333).

> ### i.        Percentage-of-Recovery Analysis

In evaluating whether a percentage fee award is reasonable, this Court must consider the

following factors:

> (1) the size of the fund created and the number of beneficiaries, (2)
> the presence or absence of substantial objections by members of the
> class to the settlement terms and/or fees requested by counsel, (3)
> the skill and efficiency of the attorneys involved, (4) the complexity
> and duration of the litigation, (5) the risk of nonpayment, (6) the
> amount of time devoted to the case by plaintiffs' counsel, (7) the
> awards in similar cases, (8) the value of benefits attributable to the
> efforts of class counsel relative to the efforts of other groups, such
> as government agencies conducting investigations, (9) the
> percentage fee that would have been negotiated had the case been
> subject to a private contingent fee arrangement at the time counsel
> was retained, and (10) any innovative terms of settlement.

In re Diet Drugs, 582 F.3d at 541 (citing Gunter, 223 F.3d at 336-40; Prudential, 148 F.3d at 336-

40).  These factors "need not be applied in a formulaic way because each case is different, and in

certain cases, one factor may outweigh the rest."  Id. at 545 (internal citations and quotation marks

omitted).

Regarding the first factor, the size of the common fund is $4,250,000 and is expected to

benefit over 148 people.  Tr. 3:17, 4:16-22.  Lead Counsel represented to the Court that based on

the claims processed as of June 7, 2016, Class Members would receive up to approximately 33%

of their recognized losses.[4]  Tr. 5:4-7.  Accordingly, the first factor is met.  Next, the second factor

---

[4] At the final fairness hearing on June 7, 2016, Lead Counsel represented that 148 Class
Members had already filed claims, though more were expected to file claims before the June 13,
2016 deadline.  Tr. 4:16-22.  Lead Counsel represented that the percentage of losses recovered
was subject to change as more Class Members submitted claims.  Tr. 5:2-7.

is satisfied because, as stated above, there have been no objections to the Settlement or to Lead Counsel's fee request. The absence of objections indicates that the settlement terms and the attorneys' fees are reasonable.  See In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 305 (3d Cir. 2005).  The third, fourth, and fifth factors are likewise met because, as discussed above, Lead Counsel are skilled attorneys, this litigation was highly complex, fraught with risk, and would likely have taken years to resolve.

The sixth factor—time devoted to the litigation—also supports the requested fee award. Lead Counsel and their professionals have spent, in the aggregate, 644.40 hours litigating this case, with a lodestar of $396,439.  Walsh Decl. ¶ 19.  The requested fee would result in a lodestar multiplier of 3.57, which is reasonable under the Third Circuit's precedent.  See Prudential, 148 F.3d at 341 (noting that lodestar multipliers ranging from one to four are frequently awarded in common fund cases); AT&T, 455 F.3d at 172 (noting the Third Circuit's prior "approv[al] of a lodestar multiplier of 2.99 in . . . a case [that] was neither legally nor factually complex." (internal quotation marks and citation omitted)).

The seventh factor is also satisfied because Lead Counsel's request for a fee award of 33% of the Settlement Amount falls within the range of reasonable fee awards.  See Brumley v. Camin Cargo Control, Inc., No. CIV.A. 08-1798 JLL, 2012 WL 1019337, at *12 (D.N.J. Mar. 26, 2012) ("The Third Circuit has noted that fee awards generally range from 19% to 45% of the settlement fund when the percentage-of-recovery method is utilized to assess the reasonableness of requested attorneys' fees." (citing In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 822 (3d Cir. 1995)); In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 109 (D.N.J. 2001) (granting a requested fee of one-third of a $4,309,205.36 settlement fund).  In addition, the ninth

factor is met because "[t]he attorneys' fees request of one-third of the settlement fund . . . comports with privately negotiated contingent fees negotiated on the open market." Id.

Further, the fee request meets the eighth factor because Lead Counsel did not benefit from the work of any government investigations or enforcement actions against Defendants. See In re Diet Drugs, 582 F.3d at 544 (affirming fee award where the District Court concluded that "while Class Counsel was in some sense beholden to the scholars who linked the diet drugs to VHD, and . . . to the FDA for its efforts to remove the drugs from the market, Class Counsel had not relied on 'the government or other public agencies to do their work for them as has occurred in some cases'" (internal citation omitted)).

Finally, although the tenth factor regarding innovation does not appear to be directly applicable here given the Settlement's traditional terms, the Court finds that, overall, the fee requested is reasonable in light of the foregoing considerations. See Brumley, 2012 WL 1019337, at *12.

### ii.      Lodestar Cross-Check

The lodestar cross-check is performed by "multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." Rite Aid, 396 F.3d at 305. When performing this analysis, the court "should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." Id. at 306. Thus, the lodestar multiplier is equal to the proposed fee award divided by the product of the total hours and the blended billing rate. If the lodestar multiplier is large, the award calculated under the percentage-of-recovery method may be deemed unreasonable, and a trial judge may consider

reducing the award appropriately. Id. at 306. The multiplier, however, "need not fall within any pre-defined range, provided that the [d]istrict [c]ourt's analysis justifies the award." Id. at 307. Further, the Court is not required to engage in this analysis with mathematical precision or "bean-counting." Id. at 306. Instead, the Court may rely on summaries submitted by the attorneys and is not required to scrutinize every billing record. Id. at 306-07.

As discussed above, Lead Counsel submits that the total number of hours expended by attorneys and their professionals is 644.40, with a lodestar of $396,439. Walsh Decl. ¶ 19. This lodestar value is based on the blended billing rates of all attorneys and professionals involved in the case, see id., and results in a lodestar multiplier of 3.57, see ECF No. 65-1 at 2. Multipliers of one to four are often used in common fund cases. Prudential, 148 F.3d at 341; see also AT&T, 455 F.3d at 172 (noting the Third Circuit's prior "approv[al] of a lodestar multiplier of 2.99 in . . . a case [that] 'was neither legally nor factually complex.'" (citation omitted)); Meijer, Inc. v. 3M, No. 04-5871, 2006 WL 2382718 at *24 (E.D. Pa. Aug. 14, 2006) (approving a 4.77 multiplier); In re Rite Aid Corp. Secs. Litig., 362 F. Supp. 2d 587, 589-90 (E.D. Pa. 2005) (approving a multiplier of 6.96); In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109, 135 (D.N.J. 2002) (approving a multiplier of 4.3).

Accordingly, and in light of the high risk of non-payment and the excellent result achieved in this Settlement, the Court finds that Lead Counsel's requested fees are also reasonable under the lodestar analysis. Therefore, the Court will grant Lead Counsel's fee in full.

**B.     Attorneys' Expenses**

Lead Counsel seeks an award of $33,569.20 in expenses incurred while prosecuting this litigation. "Counsel for a class action is entitled to reimbursement of expenses that were

adequately documented and reasonably and appropriately incurred in the prosecution of the class action." In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 108 (D.N.J. 2001) (citing Abrams v. Lightolier, Inc., 50 F.3d 1204, 1225 (3d Cir. 1995)). The Court has received no objection to Lead Counsel's requested expenses. Moreover, from the submissions, it appears the expenses requested by Lead Counsel were adequately documented, reasonable, and appropriately incurred in the litigation of this matter. Accordingly, the Court grants Lead Counsel's motion for an award of attorneys' expenses.

C.   **The Lead Plaintiff Award**

Finally, Lead Plaintiff requests an award in the amount of $3,500 to compensate him for his time and service to the Class. The PSLRA permits a lead plaintiff to receive an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class." 15 U.S.C. § 78u-4(a)(4). "[T]here are no set factors that a District Court must employ in determining the amount of class representative incentive awards." Brady v. Air Line Pilots Ass'n, 627 F. App'x 142, 146 (3d Cir. 2015) (affirming an award of $640,000).

The Court finds that Lead Plaintiff has adequately represented the Class and is therefore entitled to his requested compensation. Lead Plaintiff reviewed filings, gathered transaction records, conferred with Lead Counsel about the litigation, and remained apprised about the progress of the case and the Company generally. See Declaration of Warren H. Schuler in Support of Final Approval of Settlement, ECF No. 67, ¶¶ 3-4. These are the types of activities courts have found to support reimbursement to class representatives. See, e.g., In re Evergreen Ultra Short Opportunities Fund Sec. Litig., No. CIV.A. 08-11064-NMG, 2012 WL 6184269, *2 (D. Mass. Dec. 10, 2012) (awarding $54,626 to institutional lead plaintiffs who had "worked closely with

counsel throughout the case, communicated with counsel on a regular basis, reviewed and provided input with respect to counsel's submissions, provided information, produced documents, and participated in settlement discussions"); In re Marsh & McLennan Cos. Sec. Litig., No. 04 Civ. 8144, 2009 WL 5178546, at *21 (S.D.N.Y. Dec. 23, 2009) (awarding over $200,000 to lead plaintiffs to compensate them "for their reasonable costs and expenses incurred in managing this litigation and representing the Class" and noting that these efforts were "precisely the types of activities that support awarding reimbursement of expenses to class representatives"); In re Xcel Energy, Inc., 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (awarding $100,000 to eight lead plaintiffs who "communicated with counsel throughout the litigation, reviewed counsels' submissions, indicated a willingness to appear at trial, and were kept informed of the settlement negotiations, all to effectuate the policies underlying the federal securities laws"). Accordingly, the Court grants Lead Plaintiff's requested award.

## VI.   **CONCLUSION**

For the reasons set forth above, the Court certifies the Rule 23 class action, approves the proposed Settlement in full, awards attorneys' fees and expenses and a lead-plaintiff award, and dismisses this action with prejudice. An appropriate order accompanies this Opinion.

DATED: ___July  23___, 2016

_____
**CLAIRE C. CECCHI, U.S.D.J.**

24